IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEAN VARGO, an adult incompetent, | ) | |
| by his parent and natural guardian, | ) | |
| PATRICIA A. VARGO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1574 |
| | ) | Judge Conti |
| PLUM BOROUGH, PLUM BOROUGH | ) | Magistrate Judge Mitchell |
| POLICE DEPARTMENT, ROBERT | ) | |
| PAYNE, individually and in his capacity as | ) | |
| Chief of Police, ERIC SCHLARP, | ) | |
| individually and in his capacity as a police | ) | |
| officer of Plum Borough, DARRYL D. | ) | |
| GRANATA, JR., individually and in his | ) | |
| capacity as a police officer of Plum Borough, | ) | |
| DONALD LEE TEMPLE, JR., individually | ) | |
| and in his capacity as a police officer of | ) | |
| Plum Borough, and LISA A. LINN, | ) | |
| individually and in her capacity as dispatcher | ) | |
| for the Plum Borough Police Department | ) | |
| and for Plum Borough, | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendants Plum Borough, Plum Borough Police Department and Robert Payne

(Docket No. 27), and joined in by Defendants Eric Schlarp, Darryl D. Granata, Jr., Donald Lee

Temple, Jr. and Lisa A. Linn be granted.

II.    Report

Plaintiff, Dean Vargo ("Vargo"), an adult incompetent, by his parent and natural

guardian, Patricia A. Vargo, brings this civil rights action against Defendants, Plum Borough,

Plum Borough Police Department, Robert Payne (individually and in his capacity as the Chief of Police of Plum Borough), three Plum Borough police officers (Eric Schlarp, Darryl D. Granata, Jr. and Donald Lee Temple, Jr.) and a Plum Borough Police Department dispatcher (Lisa A. Linn).  The complaint alleges that the Defendants ignored obvious signals of Vargo's physical, mental and emotional state when the officers arrested him in the middle of the night on November 24, 2004 and placed him in the Plum Borough Police Station while they went to answer other calls.  The only person available to monitor Vargo was Linn, the police dispatcher, who was supposed to monitor him but whose video monitor was not working properly and who was not authorized to enter the cell in an emergency.  Shortly after being placed in a cell, Vargo attempted suicide and, although he was revived, he has been a human "vegetable" since the incident.

Presently before the Court is a motion for summary judgment, brought by Defendants Plum Borough, Plum Borough Police Department and Robert Payne, and joined in by Defendants Eric Schlarp, Darryl D. Granata, Jr., Donald Lee Temple, Jr. and Lisa A. Linn.  For the reasons that follow, the motion should be granted.

Facts

On November 24, 2004, Vargo, who was then age 24, went to the apartment of his girlfriend, Dana Pollitt.  (Dwayne Dep. at 22-27.)[1]  Vargo and Pollitt had been a couple for two years and had a daughter together.  (Patricia Dep. at 21-22.)[2]  They were, however, experiencing relationship problems at this time.  (Patricia Dep. at 42; Dwayne Dep. at 17.)

_____

[1]Pl.'s App. (Docket No. 32) Ex. J.

[2]Docket No. 32 Ex. G.

Approximately one week earlier, Vargo's brother, Dwayne Vargo, told him that Pollitt had been unfaithful to him with a man named Shawn Wiley. (Dwayne Dep. at 17-18; Dennis Dep. at 37-38.[3]) According to Dwayne, Vargo was "mad" about this but not out of control. This was not the first time Vargo had heard that Pollitt had been unfaithful. (Dwayne Dep. at 19-20.)

According to Vargo's mother, Patricia Vargo, several weeks earlier he had stayed at her home for several days because he was upset after learning that Pollitt had been unfaithful. (Patricia Dep. at 58-59.) He did not, however, give his mother any indication at that time that he was so upset that he was considering taking his own life. (Patricia Dep. at 60.)

Similarly, when Dwayne told Vargo about Pollitt's infidelity with Wiley a few weeks later he did not believe Vargo would try to harm himself. Rather, "he just said she was a whore and he was going to find someone else." (Dwayne Dep. at 19.) According to Dwayne, his brother was only trying to make his relationship with Pollitt work for the sake of their daughter. "He was just trying to be with her because he had a kid to her. He didn't really care, like, about her, you know.... [H]e was trying to make it work for the kid." (Dwayne Dep. at 21.)

However, on November 24, 2004, Vargo went to Pollitt's apartment and became upset when he found Jason Carmen there. Carmen is the father of Pollitt's other child. (Patricia Dep. at 25; Dwayne Dep. at 21.) Apparently, Vargo kicked the door down, threatened Pollitt and Carmen and then fled the scene. (Dwayne Dep. at 23; Schlarp Dep. at 5.[4])

Vargo's mother was told by Kerri Anderson, Dwayne's ex-girlfriend, and by J.D., Vargo's friend, that Vargo had caught Pollitt and Carmen together and/or having intercourse and

---

[3]Docket No. 32 Ex. H.

[4]Docket No. 32 Ex. C.

that he proceeded to knock the door down. By contrast, Dwayne testified that Pollitt told him

that she, Carmen and Carmen's brother were just having dinner. (Patricia Dep. at 61, 63;

Dwayne Dep. at 23-24.) According to what Patricia Vargo heard, Vargo ripped the door down,

started screaming and yelling and ultimately went after Carmen and smacked him around.

 According to Dwayne, Carmen worked with him and Vargo at a job Vargo had helped

him secure. Although Vargo had had previous altercations with Carmen, for the most part they

were civil to each other. (Dwayne Dep. at 21-22.) Patricia Vargo recalls Pollitt telling her after

the incident that she and Vargo were on the verge of splitting up and that she had been with

Carmen, the father of her boy. (Patricia Dep. at 24-25.) In fact, Patricia Vargo recalls J.D.

telling her after the incident that Vargo had been upset with catching Pollitt fooling around with

Carmen. (Patricia Dep. at 63.)

 Soon thereafter, at 3:02 a.m., Carmen called the Plum Borough Police Department and

reported what had happened to the dispatcher, Lisa Linn. (Linn Dep. at 66.)[5] During her shift on

November 24, 2004, Dispatcher Linn recalls receiving the initial emergency call in which she

learned that Vargo had just kicked the door in to an apartment and fled the scene. (Linn Dep. at

64.) She believes that during the call, Carmen also informed her that Vargo had an outstanding

warrant and was likely headed toward Kirkpatrick Trailer Court. (Linn Dep. at 67-68.)

 Dispatcher Linn was working the midnight shift on November 24, 2004. (Linn Dep. at

59-60.) This shift regularly runs from 10:30 p.m. until 6:30 a.m. and normally entails a

minimum of three officers and one dispatcher on duty. (Linn Dep. at 18-19, 60.)

 According to Dispatcher Linn, on certain days, during the afternoon shift, there are two

---

[5]Docket No. 32 Ex. A.

dispatchers on duty, in addition to a sergeant and the minimum three police officers.  (Linn Dep. at 19, 22.)  However, on the night of the incident, November 24, 2004, there were no other dispatchers on duty and only three officers, Eric Schlarp, Donald Lee Temple, and Darryl D. Granata, were working.  (Linn Dep. at 60.)

Dispatcher Linn contacted Officer Eric Schlarp, the senior officer on duty that night. (Schlarp. Dep. at 5, 7, 20.)  Officer Schlarp went to the apartment to talk to Pollitt and relayed the information about Vargo's likely whereabouts to Officers Darryl Granata and Donald Temple, and the two of them headed to the trailer park.  (Schlarp Dep. at 5; Granata Dep. at 12-13;[6] Temple Dep. at 6.[7])  While they were en route, Dispatcher Linn informed them that there was also an outstanding warrant for Vargo's arrest stemming from his failure to appear in Allegheny County court on criminal charges for possession of a controlled substance, false identification to law enforcement, possession of drug paraphernalia and driving with a suspended license.  (Granata Dep. at 15-16; Schlarp Dep. at 19-20; Linn Dep. at 64-71.)

Vargo is Arrested

Shortly thereafter, Officers Granata and Temple arrived at the trailer park home of Vargo's friend J.D., and they asked for and received permission to enter.  (Granata Dep. at 14.) Vargo did not initially make himself available to the officers.  Consequently, Officer Temple, who was accompanied by his police K-9, shouted out a verbal command to Vargo to come out or he would release the dog.  In response, Vargo yelled from the rear bedroom: "Don't send the dog. I'll come out."  (Granata Dep. at 14-15; Temple Dep. at 6.)  He immediately came out and the

---

[6]Docket No. 32 Ex. E.

[7]Docket No. 32 Ex. D.

officers informed him that he was under arrest.  (Granata Dep. at 17-18.)

Officers Granata and Temple recall that Vargo had a strong odor of alcohol on his breath when he was apprehended at the trailer court.  (Granata Dep. at 17, 33-34; Temple Dep. at 7.) Officer Granata also recalls Vargo's eyes being bloodshot and watery.  (Granata Dep. at 17.) They stated that, other than that, he "appeared normal," although they did not specifically question him.  (Schlarp Dep. at 7, 18; Temple Dep. at 8; Granata Dep. at 18.)

The officers advised Vargo to lie on the floor and he was searched and handcuffed. Vargo cooperated fully with their requests.  (Granata Dep. at 13-15; Temple Dep. at 6.)  Because Vargo was not wearing a shirt or shoes, Officer Granata went into the bedroom and retrieved his t-shirt, sweatshirt and tennis shoes and Vargo put them on.  (Granata Dep. at 17-18.)  He was then placed in Officer Granata's cruiser for transport to the Plum Borough Police Station. (Granata Dep. at 13-15.)

Although none of the officers recall noticing any signs of drug use and/or drugs being present in the trailer when they arrested Vargo, his brothers state that they were all well aware of his heroin addiction and brother Dwayne believes that heroin was being used in J.D.'s trailer that night, was present on top of the television set, and was ultimately confiscated by the police. (Schlarp Dep. at 5-6; Temple Dep. at 7-8; Granata Dep. at 34-35; Dennis Dep. at 29-30; Donald Dep. at 11;[8] Dwayne Dep. at 28.)  Defendants observe that Dwayne testified only that drugs were present, not that Vargo used them that night.  (Dwayne Dep. at 28-29.)

Despite Vargo's apparent alcohol intoxication, he was compliant during the arrest and obeyed orders.  While inside the trailer, Officer Granata advised Vargo that he had an active

_____

[8]Docket No. 32 Ex. I.

arrest warrant and recalls Vargo stating that he knew he was going to jail that night. (Granata Dep. at 17.) According to Dwayne, he was told by J.D. that Vargo had the opportunity to run from the police and actually get away that night, but decided not to do so. (Dwayne Dep. at 25-26.)

Officer Schlarp, who never specifically questioned Vargo that night, but who had interviewed Pollitt at the apartment, recalls being told that Vargo had threatened her and Jason Carmen and admits that his impression from her was that Vargo was pretty upset that night. (Schlarp Dep. at 7,18.)

Officers Granata and Temple also admit that they never specifically questioned Plaintiff that night. (Temple Dep. at 8; Granata Dep. at 18.) Despite not personally questioning Vargo that night, Officer Granata recalls him making statements in reference to Pollitt on the trip back to the station to the effect that "...that's not right. They had a child together. And what she was doing wasn't right," otherwise addressing the fact that she had another man at the apartment. (Granata Dep. at 18, 36.)

Officer Granata admits that Vargo was upset that night, but claims that he was not agitated, belligerent or distraught. (Granata Dep. at 36.) "He gave me absolutely no problems during the transport. He was calm. Was not upset. He was compliant. He obeyed every, you know, instruction he was given." (Granata Dep. at 24-25.) According to Officer Granata, Vargo gave him no indication that he would harm himself: "I don't think he was happy about the situation; let's put it that way. [But] [h]e wasn't distraught. He wasn't ranting. He wasn't making threats. He wasn't making any kind of statements to say anything." (Granata Dep. at 36-37.)

7

At 3:27 a.m., while Officers Granata and Temple were en route back to the station with Vargo, Dispatcher Linn received two emergency calls, one a bank alarm call and the other a one-vehicle accident call. Dispatcher Linn informed Officer Schlarp, the senior officer out of the three on duty, of the two emergency calls. (Linn Dep. at 75-78.) According to Dispatcher Linn, Officers Temple and Granata arrived at the Plum Borough Police Station with Vargo in custody at 3:36 a.m. (Linn Dep. at 77-78.)

Dispatcher Linn believes that Vargo was processed and placed in Cell No. 2 before the officers responded to the emergency calls. Processing entails searching the prisoner and basically removing anything from his possession that may be used to harm him. (Linn Dep. at 80-82.)

However, Officer Granata attested that, due to the emergency calls and minimum manpower available that night, Vargo was not processed, which entails gathering information from the prisoner for the reports, but rather was placed in a holding cell after being patted down for weapons and having his outer garment, belt, and shoes removed for safety and positioned out of reach but in plain view across from his cell. (Granata Dep. at 20-24.) This is standard Borough policy. (Granata Dep. at 13, 22-24; Payne Dep. at 22-23, 27-29.[9]) Vargo's handcuffs were removed and he was placed in the holding cell. (Granata Dep. at 24.)

Officer Granata believes he then told Vargo to "sit tight" for a few minutes until the officers were cleared back from the emergency calls and then someone would speak with him regarding the events of that night. (Granata Dep. at 24.) Holding cells are used for short-term incarcerations only, usually no more than a few hours, and serve to hold prisoners until they can

---

[9]Docket No. 32 Ex. F.

be transported to a more secure facility.  (Payne Dep. at 12.)

Officer Granata then left the station to respond to the accident call and support Officer Schlarp who was already on his way there, while Officer Temple responded to the bank alarm call with support from Murrysville Police Department.  (Granata Dep. at 39-41; Linn Dep. at 79-80.)  Officer Granata assisted Officer Schlarp at the accident scene because they was a damaged motor vehicle parked in the middle of the roadway and the driver had fled the scene.  (Granata Dep. at 41, 52-53.)  Officer Temple had no backup and therefore dispatch called the Murrysville Police Department and requested assistance on the bank alarm call.  (Linn Dep. at 113; Granata Dep. at 41.)  Chief Payne observed that both calls required more than one officer due to their emergency nature.  (Payne Dep. at 39.)  Dispatcher Linn stated that Officer Granata left the station to respond to the accident at 3:42 a.m. and that Officer Temple left to respond to the bank alarm at the same time.  (Linn Dep. at 85.)

According to Officer Granata, if Vargo had made any articulable threats to harm himself he would not have been left alone at the jail.  (Granata Dep. at 43.)  According to Chief Robert Payne, the policy regarding prisoners who communicate suicidal thoughts requires transporting them to the local mental hospital.  (Payne Dep. at 29.)  However, Chief Payne admits that there is no special policy regarding intoxicated prisoners and/or those with domestic issues as to whether they can be left alone.  Unless such prisoners were combative, they could be left alone.  (Payne Dep. at 31-33.)

Officers Granata and Temple both stated that they had no concerns about leaving Vargo in the holding cell.  He had given them no signs that he would harm himself.  (Granata Dep. at 42; Temple Dep. at 25.)  Had either officer observed any sign that Vargo might harm himself,

one of them would have remained at the station: "Well, at that point, we would have had to call for another assisting agency to assist Officer Schlarp. [Vargo] would not have been left alone. He probably would have still been restrained with the handcuffs, and as opposed to being placed in a holding cell, he would have been transported to Forbes Regional Hospital, which the closest facility, for involuntary commitment by our Department." (Granata Dep. at 43.) Chief Payne explained that that is standard Borough policy. (Payne Dep. at 29.) Chief Payne stated that all Borough police officers receive Act 120 training to learn how to look for and recognize possibly suicidal prisoners. (Payne Dep. at 30.)

<u>Vargo is Left at the Station</u>

Before the officers left to respond to the calls they instructed Dispatcher Linn to monitor Vargo in his cell, which means to turn the cameras on. (Linn Dep. at 82.) According to Dispatcher Linn, there are a total of five cameras situated in the station, three of which are utilized for monitoring prisoners. (Linn Dep. at 26, 28, 34-35, 53.) All five cameras can be viewed one at a time from a single monitor on the shelf in the dispatch office. (Linn Dep. at 34-35.) Monitoring prisoners is part of a dispatcher's responsibilities. (Linn Dep. at 26.) They monitor prisoners by video while continuing to dispatch officers and answer incoming calls. (Linn Dep. at 52-53.)

Dispatcher Linn admits that there are times when there are no officers present at the station and a dispatcher is left alone. (Linn Dep. at 48.) Moreover, she admits that, though rare, there are times when a dispatcher is left alone at the station with no officers present and a prisoner in a cell, usually due to emergency calls. (Linn Dep. at 49.) After Officers Temple and Granata left the station the night of November 24, 2004, Dispatcher Linn was left alone at the

station while Vargo was in his cell. (Linn Dep. at 73, 83-84.) Other than telling Dispatcher Linn to turn the cameras on, the officers did not give her any other specific instructions regarding Vargo that night. (Linn Dep. at 86.)

According to Officer Schlarp, they try not to leave prisoners and/or dispatchers alone at the station but it does happen and it is not unusual. (Schlarp Dep. at 23-24.) Chief Payne admits that there is an otherwise unwritten policy and/or procedure of the Plum Borough Police Department which allows for certain circumstances under which a prisoner may be left alone at the station without officers being present and being monitored by a dispatcher. (Payne Dep. at 24.) In fact, Chief Payne made it clear that it was not an arresting officer's job to sit and watch prisoners already in a cell, but rather they rely on the dispatchers to monitor them. (Payne Dep. at 39-41.)

Dispatcher Linn admitted that to this day the procedures at Plum Borough Police Station would still allow for her to be left alone at the station with a prisoner in a cell and no officers present. (Linn Dep. at 95-96.) According to Dispatcher Linn, when she is left alone at the station with a prisoner her duties are to monitor the prisoner from the radio room as well as to continue dispatching calls. (Linn Dep. at 53.) In fact, on the night in question, she was busy handling other calls, monitoring the officers at the bank and accident calls, as well as monitoring Vargo. (Linn Dep. at 107-08.)

Although nothing in her duties would require her to leave the radio room on a shift, Dispatcher Linn admits that she might leave the radio room to get a closer look at a prisoner in a cell if she noticed something was wrong on the monitor. (Linn Dep. at 53-55.) Notably, Dispatcher Linn admits that she has received no training regarding the potential emergency

medical needs of a prisoner under her supervision. (Linn Dep. at 47, 57, 116.) Instead, she has

been instructed to call the officers on duty if an emergency should arise and is otherwise not

permitted to do anything on her own. (Linn Dep. at 59.)

The holding cells are opened by a large key that hangs in the radio room, but only police

officers have the authority to use this key. (Granata Dep. at 26-27.) For safety reasons, police

officers generally do not enter the cells or engage the prisoner without another officer present.

However, individual officers have the discretion to enter the cell on their own should they feel

they can do so safely. (Granata Dep. at 29.) Dispatchers are not permitted to enter the cells or

have any contact with the prisoners under any circumstances. (Granata Dep. at 27; Linn Dep. at

118-19.) Even in cases where the prisoner appears to be experiencing a medical or other

emergency, the dispatchers are not permitted to open the cells because the prisoner might be

faking the emergency or may still pose a danger to the dispatcher even if the emergency is real.

(Linn Dep. at 157-58.)

Chief Payne confirms that while he was chief at Plum Borough, dispatchers did not

receive any emergency medical treatment training and that their duty was simply to notify on-

duty officers to respond to any prisoner emergencies that might arise. (Payne Dep. at 21, 25.) In

addition, police dispatchers, including Dispatcher Linn, do not have any self-defense training.

(Linn Dep. at 58.) According to Chief Payne, regardless of the nature of the medical emergency

a prisoner may be experiencing while in custody, and regardless of whether or not an officer has

been notified, the cell is not to be opened until an officer is present at the station. In fact, Chief

Payne made it clear that according to Plum Borough policy, medical treatment for a prisoner

would be delayed until an officer arrived even though there is an emergency response team

and/or an EMS stationed right across the street.  (Payne Dep. at 44-48, 57-58.)  Dispatcher Linn stated that she did not believe that she could even call for paramedics until an officer returned to the station.  (Linn Dep. at 124.)  Chief Payne indicated that, although dispatchers have the discretion to call the paramedics, they could not open the cell doors for the paramedics, but would have to await the arrival of an officer.  (Payne Dep. at 45-46.)  Because of concerns that prisoners might be faking a medical emergency or that even if the emergency is real they may still pose a danger, "the only time that the cell door will be opened for medical treatment will be done so under the supervision of a police officer because of [the police's] responsibility to protect the other folks involved in this.  That is also to include fire, first responders, EMS folks, and/or anyone else that may have to respond to that [emergency]."  (Payne Dep. at 46.)

Should the dispatcher see a prisoner having a medical emergency on the video monitor, the dispatcher is to notify a police officer in the station, who will assess the situation and determine the appropriate course of action.  If no police officer is in the station, the dispatcher is to radio an officer and call the officer back to the station.  Upon returning to the station, the officer will then determine the appropriate course of action.  (Granata Dep. at 29-30; Linn Dep. at 58-59; Payne Dep. at 46.)  Although the dispatcher can request EMS assistance, EMS may only be let into the cell by a police officer.  (Payne Dep. at 46-47.)

Vargo's Attempted Suicide

After Officers Granata and Temple left the police station in the early morning hours of November 24, 2004 to respond to the two emergency calls, Dispatcher Linn monitored Vargo's cell from her station in the radio room while continuing to communicate with the officers in the field.  (Linn Dep. at 113, 145.)  When she first checked the video monitor soon after the officers

left, she observed Vargo sitting on the bench in his cell, appearing normal.  (Linn Dep. at 86-87.)

At around 3:43 a.m., she again checked the video monitor and saw Vargo still sitting in his cell, although he had taken off his t-shirt.  (Linn Dep. at 142.)  According to Chief Payne, it is not unusual for prisoners to remove their shirts when incarcerated.  "I've had them in that cell where they've taken everything off for no reason at all.  Or taken off clothes and thrown them around.  And sometimes they get too hot, sometimes they get too cold.  I wouldn't think that by removing a shirt, in and of itself, would be a reason to consider that somebody's going to do something to themselves."  (Payne Dep. at 36.)

While monitoring Vargo on the night in question, alone, Dispatcher Linn recalls experiencing snow and/or static on the monitoring screen.  Linn admits that during this period of snow and/or static there was no picture and she could not observe him.  (Linn Dep. at 104, 106-07, 113, 144-45.)  According to Dispatcher Linn, the picture would remain full of snow and/or static until she would "flick" the monitor on and off.  (Linn Dep. at 106.)

Prior to the events of November 24, 2004, Dispatcher Linn and other dispatchers had experienced the snow and/or static problems with the monitoring system.  (Linn Dep. at 106-07.)  Based upon her memory, she believes that the other dispatchers and her supervisor Janice were aware of the problems with the monitoring system.  (Linn Dep. at 106.)  Although she could not recall whether a specific complaint or repair order had been placed about the monitor, Dispatcher Linn admits that the entire station was aware of it after the incident involving Vargo.  (Linn Dep. at 105.)

Officer Granata recalls hearing non-specific complaints about the monitoring system malfunctioning.  (Granata Dep. at 106.)  Officer Temple recalls hearing about a "flicker" on the

screen.  (Temple Dep. at 24.)

When asked about the snow or static on the monitor, Chief Payne responded as follows:

> The time that I was there, I know that there had been repairs.  There had been maintenance done.  I don't know what maintenance schedule there would be.  If there were issues or problems, normally what would occur is that those problems associated with those functions would be brought to the attention of [the supervisor of the dispatchers], and that she had the authority to call the repair people in to have the things taken care of.

(Payne Dep. at 16.)  When asked specifically when the repairs were done, Chief Payne could not state affirmatively whether they occurred before or after November 24, 2004.  (Payne Dep. at 18-19.)

Dispatcher Linn admits that when she experienced the snow and/or static on the monitoring screen on November 24, 2004, she could not see Vargo at all.  (Linn Dep. at 111.)  At some time between 3:43 a.m. and 3:50 a.m., while on the phone with Murrysville Police, she noticed the problem and after flicking the screen on and off, she saw Vargo in a kneeling position, motionless and toward the front of his cell.  (Linn Dep. at 111-15.)  It appeared to Dispatcher Linn that Vargo was hanging and that something was around his neck.  (Linn Dep. at 115.)  Prior to this, she recalls observing him just sitting in his cell with his back to the camera.  (Linn Dep. at 112.)

Although Dispatcher Linn initially testified that when she noticed the blank screen she simply flicked the monitor on and off and regained a picture, upon reviewing the videotape she admitted that it appears that the monitor was flickering in and out that night and must have required multiple flicks to regain a picture.  Moreover, when asked to explain the extended interference and apparent delay in regaining a clear picture, Dispatcher Linn had no specific explanation other than the fact that she was busy handling other calls and talking to the officers.

(Linn Dep. at 149-51.)

Soon thereafter, Dispatcher Linn ran to the squad room to observe Vargo through a small window in the cell door and confirmed that he was hanging there, motionless. (Linn Dep. at 115, 118-19.) It appeared to her that Vargo had used a t-shirt to hang himself. (Linn Dep. at 119-20.) Dispatcher Linn admits that when she first noticed on the monitor that he was motionless she did not place any emergency calls. Not until after she confirmed what she had seen on the monitor did she radio the officers to return to the station at approximately 3:50 a.m. (Linn Dep. at 113-15.)

### Officer Granata Returns to the Station

Dispatcher Linn sent a 10-19 message to Officer Granata, which means to return to the station as soon as possible. (Linn Dep. at 113, 122.) She recalls Officer Granata contacting her by radio while he was already on his way back to the station, upon which she advised him of the situation. Notably, Dispatcher Linn was not told to call the paramedics. (Linn Dep. at 122-23.) Officer Granata arrived at the station at approximately 3:53 a.m. and he told her to call the medics. (Linn Dep. at 123-24; Granata Dep. at 57.)

Officer Granata recalls being approximately one to one and a half minutes away from the station when he received the 10-19 message. (Granata Dep. at 54.) Officer Granata states that he arrived back at the station, met Dispatcher Linn at the front door, grabbed the cell key and ran inside to check on Vargo. (Granata Dep. at 54.) He then observed Vargo suspended by the t-shirt he was wearing earlier that Granata had retrieved for him at the trailer. (Granata Dep. at 55.) According to Officer Granata, the shirt was affixed to a stationary portion of the cell wall, basically tied in a knot and threaded through the cage consisting of a mesh and/or metal material

16

and then braided and tied around his neck.  (Granata Dep. at 55-56.)

According to Officer Granata, Vargo was in a slouched position, with his knees bent and his toes touching the ground.  Apparently, Vargo had allowed his own body weight to pull him down.  (Granata Dep. at 55.)  Thereafter, Officer Granata grabbed Vargo around the waist, under the chest area in an attempt to relieve the tension of his body weight.  At that point Officer Granata tried to untie the knot, but was unsuccessful because it was too tight, so instead he laid Vargo back down.  Then Officer Granata ran to the dispatch area to grab a pair of scissors approximately thirty feet away, returned to the cell, lifted Vargo up and cut the shirt with the scissors.  (Granata Dep. at 56-59.)

Although Officer Granata does not recall the exact timing of the events and whether or not anyone was available to assist him in lifting Vargo and/or retrieving the scissors, he does recall advising Dispatcher Linn to call the medics and then sending her out to his cruiser to get the bag valve mask.  (Granata Dep. at 57; Linn Dep. at 125-26.)  After cutting Vargo down, Officer Granata recalls laying Vargo down on the cell floor and administering CPR to him.  Notably, he then tried to utilize the Automatic External Defibrillator (AED) located in the squad room.  Although he opened an airway, attached the machine and attempted to do an evaluation, he could not find a pulse and realized that the AED was not functioning.  At that point he stopped using the machine and administered CPR.  According to Officer Granata, the AED did have power, but for some unknown reason did not work that night and has been since sent out for repair.  (Granata Dep. at 59-60.)

Thereafter, Officer Granata continued administering chest compressions and rescue breathing with the bag valve mask Dispatcher Linn had retrieved for him.  (Granata Dep. at 32,

60.)  During that time, Officer Temple arrived and they began two-man CPR to which Vargo responded with a weak pulse and some gurgling respirations after approximately one or two cycles.  (Granata Dep. at 61; Temple Dep. at 22; Linn Dep. at 128.)

This continued until the paramedics arrived and took over Vargo's care at 4:00 a.m. (Granata Dep. at 61-63; Linn Dep. at 124.)  Thereafter, the officers assisted the paramedics in preparing Vargo for transport.  (Granata Dep. at 63.)  EMS transported Vargo to Forbes Regional Hospital, and from there he was lifeflighted to Allegheny General Hospital for treatment. (Patricia Dep. at 81-82.)

After Vargo was transported, the officers secured the scene, contacted Chief Payne and awaited his arrival.  (Granata Dep. at 64.)  That night they spoke with Chief Payne around 4:17 a.m. about the incident and were then interviewed by Allegheny Homicide the next morning at the behest of the Chief.  (Granata Dep. at 64; Linn Dep. at 133; Payne Dep. at 50.)

Vargo suffered serious and permanent injuries as a result of his attempted suicide at the Plum Borough Police Station on November 24, 2004, and now requires twenty-four hour care and needs assistance walking and feeding himself.  (Patricia Dep. at 77-79, 85.)

Vargo had no history of suicide attempts.  (Patricia Dep. at 35; Dennis Dep. at 27; Pl.'s Answer Defs.' Interrog. No. 11.[10])  He had no history of mental health problems, was never treated by a psychiatrist, psychologist or other mental health professional for depression, suicidal thoughts or any other serious mental health issues, and had never been prescribed or taken any medication for any mental health issues.  (Patricia Dep. at 36-38; Dwayne Dep. at 16; Donald Dep. at 15; Pl.'s Answer Defs.' Interrog. No. 12.)

_____

[10]Defs.' App. (Docket No. 29) Ex. J.

Vargo's attempted suicide was a complete shock to those who know him best. His mother saw him nearly every day for two years up to November 24, 2004, and never observed any signs that he was danger to himself. (Patricia Dep. at 21, 35.) When Vargo told his mother about Pollitt's infidelity a month before, he made no indications that he was so upset that he would contemplate suicide: "No. He would never take his own life." (Patricia Dep. at 58.)

Similarly, Vargo's twin brother, Dennis, who worked with him every day and was very close to him, never had any reason to believe that Vargo would harm himself: "No, I just know that he wouldn't try to kill himself. I mean, we was real close. He was staying with me at the time and he didn't talk to me about it. And usually he talked to me about everything. So if he was thinking about killing himself he would have came to me before anything." (Dennis Dep. at 29.)

Vargo's other brothers echoed these same sentiments. Dwayne, who saw Vargo "pretty much every day" and who told him about Pollitt's affair with Wiley a week earlier, did not believe Vargo was so upset that he posed a danger to himself. (Dwayne Dep. at 16, 19.) He said: "No, I never thought he would do that." (Dwayne Dep. at 14, 19.) In fact, Vargo visited Dwayne's home the day before his attempted suicide and appeared and acted completely normal: "He was cool.... We was just hanging out, playing PlayStation." (Dwayne Dep. at 26.) Similarly, Vargo's brother Donald was shocked when he learned of the suicide attempt: "It was a big shock." (Donald Dep. at 14.) Vargo had never told Donald that he was depressed or given Donald any indication that he was a danger to himself. (Donald Dep. at 14.)

Procedural History

Plaintiff filed this action on November 24, 2006. Count I alleges that Defendants violated

Vargo's civil rights under the Eighth and Fourteenth Amendments to the Constitution by acting with deliberate indifference to his special needs while he was in their custody and pursuant to the state-created danger theory of liability, and these claims are brought pursuant to 42 U.S.C. § 1983. Counts II-III alleged state law claims, specifically: negligence (Count II) and "municipal breach of duty" (Count III).

On May 15, 2007, an order was entered granting Defendants' partial motion to dismiss and dismissing Counts II and III. Thus, only the § 1983 claim remains. On June 16, 2008, a motion for summary judgment was filed by Defendants Plum Borough, Plum Borough Police Department and Robert Payne. On September 29, 2008, Plaintiff filed an Amended Complaint in which Officers Schlarp, Granata and Temple and Dispatcher Linn were substituted for John Does (Docket No. 44). On October 10, 2008, these defendants filed a motion to adopt the co-defendants' summary judgment arguments (Docket No. 46), and this motion was granted on October 15, 2008.

<u>Standard of Review</u>

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Defendants argue that:1) Vargo did not have a particular vulnerability to commit suicide that they were made aware of; 2) the Borough policy of leaving prisoners who show no signs of suicidal tendencies alone under the supervision of dispatchers, who cannot enter the cells unless accompanied by a police officer, is not deliberately indifferent to those prisoners' rights because there was no reason to believe they might harm themselves and require immediate medical attention, and the Borough's policy of not permitting dispatchers or EMTs to enter prisoner cells unless accompanied by a police officer was not deliberately indifferent to prisoners' rights because they might be faking the medical emergency or even if it is real they may still pose a danger; 3) Plaintiff has failed to produce sufficient evidence to support a supervisory liability claim against Chief Payne, who played no role in the events at issue; 4) Plaintiff has failed to produce sufficient evidence to sustain a claim under the state-created danger theory of liability; and 5) even if a constitutional violation took place, the individual defendants are entitled to qualified immunity because it was not clearly established on November 24, 2004 that non-suicidal prisoners could not be left alone with officials who could not enter the cells even in cases of medical emergencies. In addition, Officers Granata, Schlarp and Temple and Dispatcher Linn contend that the claims against them are time barred and Officer Schlarp, whose

participation in the events in question ended when he interviewed Pollitt at her apartment, cannot be held liable for subsequent events that happened during Vargo's arrest, transport, detention, monitoring or medical care.[11]

Particular Vulnerability of Vargo to Commit Suicide

Vargo was a pretrial detainee when he attempted suicide. The Court of Appeals for the Third Circuit has held that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." Colburn v. Upper Darby Township, 838 F.2d 663, 669 (3d Cir. 1988) ("Colburn I"). In a subsequent appeal in that case, the court elaborated on that statement as follows:

> a plaintiff in a prison suicide case has the burden of establishing three elements:
> (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.

Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991) ("Colburn II"). The court noted in Colburn II that "prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" Id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).[12]

---

[11]Because the Court should grant summary judgment based on the arguments that Vargo did not present a particular vulnerability to commit suicide and that other Borough policies were not deliberately indifferent to his needs, the Court need address the individual defendants' other arguments.

[12]     Because a pretrial detainee has not been convicted of any crime, the due process clause of the Fourteenth Amendment prohibits the state from imposing punishment. Bell v. Wolfish, 441 U.S. 520, 535 (1979). However, the Court of Appeals has borrowed the cruel and unusual punishment prohibition of the Eighth Amendment because the due process rights of

(continued...)

A particular vulnerability to suicide represents a serious medical need.  Id.  "The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition."  Id. at 1024.  "[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."  Id. (citations omitted).

However, "[e]ven where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood."  Id.  There is no liability "for a negligent failure to protect a detainee from self-inflicted injury."  Id.  Rather, the level of heightened culpability required is "deliberate indifference."  The Supreme Court has defined the phrase as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The Court of Appeals has placed the following gloss on Farmer:

> The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk.  Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

---

[12](...continued)
pretrial detainees are at least as great as the Eighth Amendment rights of convicted and sentenced prisoners and because the Supreme Court has not yet determined how much more protection unconvicted prisoners should receive.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 n.5 (3d Cir. 2005) (citations omitted).

Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38, 842, 844).

In the Colburn case, a detainee committed suicide by shooting herself while in jail with a gun that was not found even though she had been searched three times (and these searches uncovered a round of ammunition and valium pills which were confiscated).  In Colburn I, the Court of Appeals reversed the district court's order dismissing the case.  However, in Colburn II, the court affirmed the granting of summary judgment in favor of the defendants.  The court held that the custodial officer's knowledge that the detainee was intoxicated, had had an argument with her boyfriend, had tried to ingest three pills and had an undischarged bullet in her pocket did not demonstrate that she had a particular vulnerability to commit suicide of which the custodian should have been aware.  See also Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir. 1988) (officer's failure to recognize scars on pretrial detainee as attempted suicide marks amounted to negligence, at most, and could not support a claim for deliberate indifference when he hanged himself in the cell); Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1989) (although pretrial detainee had a long history of suicide attempts and mental illness which was known to some members of the police department, there was no evidence that the particular officers watching him on the night he committed suicide in the cell were aware of these facts and thus their acts of failing to remove his belt and leaving him unsupervised for 25 minutes amounted at most to negligence).

In a more recent pretrial detainee suicide case, the Court of Appeals reiterated the Colburn analysis.  Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005).  In that case, Richard Lee Woloszyn committed suicide while being held at the Lawrence County Correctional

Facility ("LCCF"). His widow filed a § 1983 claim and the defendants filed a motion for summary judgment. The Court of Appeals observed that the record contained the following evidence concerning Woloszyn's mental state: 1) the officer who transported him to the LCCF reported him to be "in good spirits and joking"; 2) the booking officer stated that he was very remorseful and distant, he wanted to talk about how he had failed as a father and a person, he talked about how his children no longer came to him and that hurt him and he said that he was glad that he got caught because he wanted it to stop, he was on a 24-hour rampage, and he had done every drug possible, but she indicated that Woloszyn told her he was not suicidal; 3) a nurse who performed a medical examination found him to be polite, cooperative, alert and not agitated, he did not appear to be under the influence of drugs, did not request a physician or counselor and had no psychiatric history, so she informed the captain that Woloszyn was medically stable and needed to be checked hourly only for signs of alcohol withdrawal; and 4) corrections officers who escorted him to the housing unit and observed him there stated that they saw nothing unusual or remarkable about his behavior, noting that he spelled his name and indicated that he wanted juice in the morning. Id. at 322-23.

Based on this record, the Court of Appeals concluded that the district court correctly determined that the plaintiff had failed to present a genuine issue of material fact that Woloszyn had a particular vulnerability to suicide. The only pieces of evidence plaintiff presented in support of Woloszyn's vulnerability were the statements in the booking officer's affidavit about Woloszyn not answering her questions, talking about failing as a father and being on a drug and alcohol binge. The Court of Appeals held that "we do not think such statements, without more, are sufficient to create a genuine issue of material fact regarding knowledge of Woloszyn's

vulnerability to suicide. They do not show that there was a 'strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" <u>Id.</u> at 323.

In this case, Vargo provided even less information to the officers from which they could have determined that he had a particular vulnerability to suicide than Woloszyn did and considerably less information than was presented to the officers in the <u>Colburn</u>, <u>Williams</u> and <u>Freedman</u> cases. The record is undisputed that Vargo was not distraught, that he complied with police commands, that he turned himself in without incident and that he said only that it "wasn't right" that he had found Pollitt with Carmen. The record is further undisputed that Vargo had no history of suicide attempts, that his family was unaware that he might have been depressed and that the people who knew him best were shocked when they learned of his attempted suicide. Despite Plaintiff's attempt to argue that Vargo was "clearly upset, yet complacent," the record does not support a finding that he had a particular vulnerability to commit suicide or that Defendants had any basis for being aware of any vulnerability he might have possessed.

Plaintiff further argues that Defendants' liability should be based on their failure to screen Vargo upon his arrest. However, as the discussion above indicates, each case has been decided on its own merits and there is no bright-line test that imposes liability because a prisoner has not been screened. Defendants also note that Plaintiff can offer no more than conjecture that a screening would have made a difference, given that Vargo's family had seen no signs that he wished to harm himself, he had no history of attempted suicide and he was calm throughout his arrest, transport and initial lock-up.

In <u>Colburn II</u>, the Court of Appeals noted that the "booking process at the Upper Darby jail includes no formal physical or mental health screening." 946 F.2d at 1023. Nevertheless,

summary judgment for the defendants was upheld. The court has never held that the lack of a screening process alone demonstrates deliberate indifference.[13] As the court more recently confirmed, "the Colburn test is detainee-specific, and in this case the Estate failed to submit sufficient evidence to create an issue of fact that there was a 'strong likelihood' Schuenemann would commit suicide." Schuenemann v. United States, 2006 WL 408404, at *3 (3d Cir. Feb. 23, 2006) (footnote omitted).[14] Similarly, Defendants herein cannot be held liable based on their failure to screen Vargo for suicidal tendencies when the record presents no genuine issue of material fact that he presented a particular vulnerability to commit suicide, and no issue of fact that Defendants were aware of any such vulnerability.

Other Issues

Plaintiff also argues that: 1) the officers did not follow their regular procedure, which would have resulted in Vargo's being taken to the Allegheny County Jail where he would have been evaluated; 2) the malfunctioning video monitor demonstrates deliberate indifference; 3) the policy of Plum Borough of requiring dispatchers to monitor prisoners but not giving them authority to enter the cell if they see a problem contributed to Vargo's situation by delaying the

---

[13]Several other courts of appeals have explicitly held that there is no constitutional right to be screened for suicidal tendencies. See Whitt v. Stephens County, 529 F.3d 278, 284 n.10 (5th Cir. 2008); Barber v. City of Salem, Ohio, 953 F.2d 232, 240 (6th Cir. 1992); Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990).

[14]In Schuenemann, the Court of Appeals affirmed this Court's order granting summary judgment in favor of the defendants when a pretrial detainee, who showed no signs of suicidal behavior, did not threaten to harm himself and gave no reason for anyone to suspect that he was contemplating suicide, hanged himself after being returned to the Allegheny County Jail following a detention hearing in this Court. Notably, his attorney, a caseworker and two corrections officers all interacted with Schuenemann after the hearing and saw nothing that alerted them to the possibility that he had a particular vulnerability to suicide.

arrival of help; 4) the officers made the situation worse by first attempting to untie the knot and then going to get scissors to cut Vargo down; and 5) the AED failed to function.

Defendants respond that each one of these points has been raised and rejected in other cases, that they amount at most only to negligence and that, in any event, because the record does not contain material facts from which the jury could conclude that Vargo had a particular vulnerability to commit suicide and that Defendants were aware of it, these other facts do not change the situation. They also observe that, because there were never any suicides or attempted suicides at the Plum Borough Police Station prior to this incident, there is no basis for concluding that the Borough's existing policies–which consisted of requiring officers to obtain Act 120 training, transporting detainees to Forbes Regional Hospital for involuntary commitment upon observing any signs of suicidal tendencies, searching prisoners upon arrival at the station, removing their shoes and belt prior to lock-up and monitoring them by video–were "obviously" inadequate. For the reasons that follow, the Court should conclude that Defendants' arguments are availing.

Plaintiff's argument concerning where Vargo was sent is that, according to Plum Borough policy, he should have been taken to the Allegheny County Jail based on his having committed a misdemeanor 2 or higher charge. At the County Jail, Plaintiff maintains that Vargo would have been screened and his vulnerability to commit suicide would have been discovered. This argument is unavailing for several reasons. First, in the testimony Plaintiff cites, Officer Granata indicates that all prisoners are taken first to the Plum Borough Police Station and thereafter to the County Jail, although the amount of time the prisoner spends at the police station may be less for those arrested on a misdemeanor 2 or higher charge as compared to those arrested on a bench

warrant. (Granata Dep. at 18-22.) Thus, Vargo would have been brought to the police station in any event. Second, this alleged failure to follow a policy of Plum Borough did not subject Vargo to a deliberate indifference to his particular vulnerability to commit suicide because, as the discussion above indicates, he presented no such vulnerability. Finally, Plaintiff can only speculate that a screening of Vargo at the County Jail would have revealed his vulnerability even though nothing he said or did that night or in the weeks before gave his family, friends or the arresting officers any reason to believe he had this vulnerability.

With respect to the malfunctioning video monitor, the Court of Appeals addressed this issue in Serafin v. City of Johnstown, 53 Fed. Appx. 211 (3d Cir. 2002):

> Serafin argues that the City's reliance on defective video equipment to monitor pretrial detainees at risk for suicide demonstrated deliberate indifference to their safety. The video monitor trained on Serafin's cell had a history of problems; it had been repeatedly fixed in response to complaints of blurriness.
>
> Because the City relied on the use of a monitor to watch the activities of intoxicated detainees at risk for suicide, the adequacy of these monitors was critical. The record indicates, however, that the City repeatedly repaired the monitor in question in response to complaints. Moreover, even if the City had not promptly arranged for those repairs, the monitor still functioned adequately for a clerk to observe most signs of distress. At worst, then, the record demonstrates negligence on the City's part, and negligence is simply not enough. Consequently, Serafin has not met the heavy burden of demonstrating deliberate indifference vis-a-vis the video equipment.

Id. at 215.

The record in this case is not as clear: Chief Payne testified that there had been repairs to the monitor, but his testimony does not indicate when this occurred or whether he was aware of the problems prior to Vargo's attempted suicide. In addition, and unlike the situation in Serafin, the monitor in this case apparently did not function adequately for the dispatcher to observe signs of distress unless she flicked it.

Nevertheless, as Defendants observe, the court in <u>Serafin</u> was addressing a video monitor used to watch the activities of intoxicated detainees *at risk for suicide*, but in this case, Vargo was not such an individual. The Court of Appeals has never held that video monitoring of all pretrial detainees is required or conversely, that failure to implement such monitoring demonstrates deliberate indifference even if the prisoner has not presented evidence that he had a particular vulnerability to commit suicide. On the contrary, the court held in <u>Freedman</u> that deliberate indifference could not be demonstrated based on the city's policy of failing to require video surveillance of all pretrial detainees when the record established that the failure to identify Freedman as a suicide risk and place him in a specially monitored cell amounted at most to negligence. 853 F.2d at 1116. Moreover, as noted above, the court found that officials were not deliberately indifferent in <u>Williams</u> when they failed to remove the detainee's belt and left him unsupervised (i.e., not monitored in any fashion) for 25 minutes. 891 F.2d at 466. Finally, the court did not find deliberate indifference in <u>Colburn</u> when the detainee committed suicide in a corner of the cell not visible on the video monitor. 946 F.2d at 1021.

Thus, Defendants did not demonstrate deliberate indifference because the video monitor was malfunctioning. The same analysis would apply to the malfunctioning AED. At worst, it demonstrates negligence on the part of the police department for failing to have the unit checked, but it does not rise to the level of deliberate indifference. Similarly, the criticism of Officer Granata, who first attempted to untie the knot around Vargo's neck and then, when he was unable to do so, returned Vargo to the position he had been in for a moment while the officer ran to obtain scissors to cut him down, does not demonstrate that Defendants were deliberately indifferent. Rather, Officer Granata was trying to save Vargo and his actions, even if arguably

negligent, did not rise to the level of deliberate indifference.

With respect to the Borough's policy of prohibiting dispatchers from entering the cells without the presence of a police officer, this same question was raised in Long v. Collins, 1990 WL 67222 (E.D. Pa. May 18, 1990), aff'd mem., 947 F.2d 936 (3d Cir. 1991). The court stated that:

> Because Long did not demonstrate a suicidal propensity, the policy of having turnkeys radio for help did not amount to deliberate indifference. In Williams, the custodial officers neglected to remove the detainee's belt, and left the detainee unsupervised (i.e., only a non-custodial employee was present) for at least twenty-five minutes. The third circuit found no deliberate indifference because the custodial officers did not know of the detainee's suicidal propensity. Here, where the detainee had never exhibited a suicidal propensity, entrusting supervision to a custodial employee, who could, and did, summon medical help within 30 seconds, falls well short of culpable behavior under Williams.

Id. at *4 (citing Williams, 891 F.2d at 466-67 (footnote omitted)).

Plaintiff argues that Long is distinguishable because help was summoned within 30 seconds, but in this case more time elapsed, and Vargo suffered oxygen deprivation to his brain during these crucial minutes. Although this may well be an accurate summary of the facts, the court's decision in Long was not based on the length of time it took to summon help. Rather, the court's holding was that, because Long did not demonstrate a suicidal propensity, the policy of having turnkeys radio for help (instead of entering the cells themselves) did not amount to deliberate indifference. The same analysis applies here. Vargo did not demonstrate a suicidal propensity and therefore the Borough policy of having the dispatcher call an officer rather than enter the cell does not demonstrate deliberate indifference.

Finally, Plaintiff contends that, once Dispatcher Linn observed Vargo hanging in his cell on the video monitor, two parts of the deliberate indifference test were met (i.e., Vargo had a

particular vulnerability to commit suicide and Defendants were made aware of it) and that the actions taken by Defendants thereafter present a genuine issue of material fact as to whether they were deliberately indifferent to his medical need. This argument fails for several reasons.

First, Plaintiff cites no authority to support the argument that the facts should be analyzed in this way. Rather, all of the cases examine whether the pretrial detainee gave the officials any reason to be aware that he or she had a particular vulnerability to commit suicide *before* the attempt was made, not at the point the attempt was undertaken. All of the cases cited above could have been analyzed the way Plaintiff argues, but they were not. For example, the Court of Appeals did not conclude that, at the moment the detainee in <u>Colburn</u> was discovered attempting to ingest three valium pills, she demonstrated a particular vulnerability to commit suicide of which the defendants were aware such that their failure to search her thoroughly enough to discover the gun she was concealing demonstrated deliberate indifference.

Second, as discussed above, as explained above, the actions taken by Defendants after Vargo was discovered hanging in his cell were negligent, at most, and certainly not deliberately indifferent to Vargo's needs. Therefore, even assuming that two parts of the deliberate indifference test were satisfied, the record is undisputed that the third part was not.

<u>State-Created Danger Theory of Liability</u>

Plaintiff also argues that Defendants may be held liable under the state-created danger theory of liability. This theory is an exception to the rule that the Constitution generally confers no affirmative right to governmental services. <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 196 (1989). The Court of Appeals has noted that:

> <u>DeShaney</u> stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody. [H]owever,

this does not mean that no constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him "more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003). This complement to the DeShaney holding has come to be known in its progeny as the "state-created danger doctrine."

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (footnote omitted), cert.

denied, 127 S.Ct. 1483 (2007).

The Court of Appeals has adopted a four-part test for the state-created danger theory:

(1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Bright, 443 F.3d at

281) (footnote omitted). In Bright, the court emphasized that:

[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiff's detriments in terms of exposure to danger. It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.

443 F.3d at 282 (citation omitted).

As explained above, the record provides no basis for concluding that the harm caused to

Vargo was foreseeable and fairly direct, because he had given Defendants no indication that he

had a particular vulnerability to commit suicide. Moreover, Plaintiff has not pointed to any

affirmative acts which caused Vargo's exposure to danger to be increased. Rather, Plaintiff has

identified only failures to do more and possibly negligent behavior, which is insufficient as a

matter of law. Therefore, Defendants cannot be held liable based on the state-created danger

theory of liability.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendants Plum Borough, Plum Borough Police Department and Robert Payne (Docket No. 27), and joined in by Defendants Eric Schlarp, Darryl D. Granata, Jr., Donald Lee Temple, Jr. and Lisa A. Linn be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: October 24, 2008